SEALED

FILED
U.S. DISTRICT COURT

2009 JUN 12  P 1: 21

DISTRICT OF UTAH

BY: _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JOSEPH T. SORENSON,<br><br>Plaintiff,<br><br>v.<br><br>JOSE ARTURO RIFFO et al.,<br><br>Defendants. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>**(Under Seal)[1]**<br><br>Case No. 2:06-cv-749 CW<br><br>Judge Clark Waddoups |

This matter is before the court on Plaintiff's Motion for Entry of Judgment and to Dismiss

Counterclaims.  Plaintiff Joseph T. Sorenson ("Sorenson") asserts that Defendants have knowingly

based their case on forged documents and have thereby intentionally abused the judicial process.

Defendants do not to dispute that certain documents were forged,[2] only who did the forgeries.  After

holding an evidentiary hearing on the matter, the court concludes that Defendants have knowingly

proffered forged documents to benefit their case.[3]  Because this is an abuse of the judicial process,

the court dismisses Defendants' counterclaims as a sanction for Defendants' actions.  The court will

---

[1]  This memorandum is being filed under seal because it discloses the content of documents produced pursuant to a protective order and filed under seal with the court.  Upon motion of any party, the court will hear argument on whether this memorandum should be made public in full or in a redacted version.

[2]  In Defendants' memorandum in opposition to this motion, Defendants referred to an expert report of George Throckmorton that stated four documents are trace-forgeries.  Defendants stated they "have never and do not now contest that finding."  Mem. in Opp. to Plaintiff's Mot. for Entry of Judgment and to Dismiss Counterclaim, at 2 (Docket No. 195).

[3]  The court's ruling is based on the pleadings on file on this matter, the documentary evidence presented by the parties, and the testimony taken at the evidentiary hearing.

not enter judgment, however, on Sorenson's claims because dismissal of the counterclaims is an adequate sanction for Defendants' actions.

## FINDINGS OF FACT

Defendant Jose Arturo Riffo represents himself as a quantum physicist and nuclear engineer that has been involved in the development of new DNA technology.[4] Defendants allege that Sorenson and Defendants entered into a Business Asset Purchase Agreement (the "Agreement"), whereby Sorenson agreed to purchase a forty-percent interest in two corporations that held the DNA technology.[5] The two corporations, Crypto Corporation, Inc. ("Crypto") and Global Database Information Systems, Inc. ("Global"), are among the defendants in this action. Under the terms of the purported Agreement, Sorenson agreed to pay $100 million for an interest in the companies.[6] Sorenson contends he paid over $2.5 million to Defendants, but sought the return of his money when he learned Defendants made false representations to him about the DNA technology and other facts.[7]

### October 7, 2005 Meeting

During the evidentiary hearing, Sorenson and Defendants Jose Arturo Riffo ("Riffo") and Alan C. Monson ("Monson") acknowledged meeting on October 7, 2005, to execute the Agreement and all exhibits thereto. Exhibit "C" to the Agreement is a Confidentiality Agreement, which Monson testified that he drafted. Monson further testified that he then drafted a second version of

---

[4] Answer, Amended Counterclaim, Third-Party Complaint, and Jury Demand, ¶¶ 14, 18 (Docket No. 24).

[5] Id. ¶¶ 6, 10; Business Asset Purchase Agreement, at 1 (Plaintiff's Ex. 26).

[6] Business Asset Purchase Agreement, at 1 (Plaintiff's Ex. 26).

[7] Complaint, ¶¶ 42, 46 (Docket No. 1).

the exhibit and carried it to the meeting in his briefcase. Monson asserts the second version was one that Riffo had used in other transactions.

According to Sorenson, Riffo, and Monson, the parties did execute the Agreement and all exhibits thereto, including the first version of Exhibit "C", at the October 7th meeting.[8] Either the initials or signatures of Sorenson, Riffo, and Monson appear on *each* page of the Agreement and exhibits.[9]

After the Agreement and exhibits were fully executed, Riffo and Monson assert that Riffo reviewed Exhibit "C" and said he wanted to use the other version of the exhibit. Monson testified he then pulled the second version out of his brief case, wrote "Exhibit C" at the top, and that the parties all signed the second version to replace the first version.[10] Although Riffo and Monson's initials or signatures appear on each page of the document, Sorenson's initials are notably absent from the document.[11] Only the last page of the document bears his signature.

Monson and Riffo testified that on October 7, 2005 they watched Sorenson sign the second version of Exhibit "C". After Sorenson signed it, Monson testified that the original was given to Riffo. Defendants, however, did not produce the original in this litigation despite a request for it. Riffo testified the original was stolen from his vehicle, along with other items. Riffo provided no

---

[8] See Business Asset Purchase Agreement (Plaintiff's Ex. 26); see also Confidentiality and Non-Disclosure Agreement (Plaintiff's Ex. 8).

[9] See Business Asset Purchase Agreement (Plaintiff's Exs. 26 and 8). On the last page of the Agreement, Riffo signed on behalf of Crypto, Monson signed on behalf of Global, and Sorenson signed as an individual.

[10] See Exclusivity and Confidentiality of Information Agreement (Plaintiff's Ex. 6).

[11] See Exclusivity and Confidentiality of Information Agreement (Plaintiff's Ex. 6) (showing only Riffo and Monson's initials).

-3-

documents, however, to show when the vehicle break-in occurred or what items were reported stolen.

**Termination of the Agreement**

At about the time of the meeting, Sorenson became the CEO of Crypto and Global.[12]  By December 8, 2005, however, Sorenson resigned his position and asked Riffo to terminate the Agreement and return his $2.5 million.[13]  Sorenson contends he terminated the Agreement because Defendants did not have the purported technology and private investigations had not resolved concerns about Defendants.  Defendants contend Sorenson terminated the Agreement only because he received pressure from his father and not because the technology was deficient in any way.

When Defendants did not return the $2.5 million to Sorenson, Sorenson filed this action.  He asserted claims for securities fraud, common law fraud, and other causes of action.  Version one of Exhibit "C" expressly provides:

> The Parties hereto acknowledge their understanding that this Agreement is connected with the sale and purchase of marketable securities which are regulated by Federal and/or State law and that this Agreement and its contents are confidential in order to protect the integrity of the Private Placement for the benefit of investors, and to comply with any applicable requirements of the law.[14]

Notably, this provision is not included in the second version of Exhibit "C" that Defendants claim Sorenson signed.

Defendants then filed a counterclaim against Sorenson.  Defendants alleged breach of the

---

[12]  Sorenson Depo. 52:18–25 (Jan. 10, 2008) (Docket No. 195, Ex. B); Resignation Letter (Dec. 8, 2005) (Docket No. 195, Ex. D).

[13]  Resignation Letter (Dec. 8, 2005) (Docket No. 195, Ex. D).

[14]  Confidentiality and Non-Disclosure Agreement, ¶ 4 (Oct. 7, 2005) (Plaintiff's Ex. 8).

Agreement due to Sorenson's failure to pay the $100 million. They also alleged breach of the Confidentiality Agreement, basing their claim on the second version of Exhibit "C". Defendants attached the now admittedly forged Exhibit "C" to their counterclaim and claimed it is valid. Defendants have not moved to withdraw the counterclaim nor moved to substitute the authentic version of Exhibit "C", not withstanding their admission that the Exhibit is a forgery.

**Letters**

During discovery, Defendants also produced photo-copies of three letters. The three letters all express Sorenson's purported excitement over the technology. The first letter, dated November 15, 2005, also indicates that Sorenson's father was excited about the technology, and that Sorenson was concerned he would be pushed aside so his brother could step in.[15] Besides expressing excitement over the project, the second letter, dated November 29, 2005, affirms Sorenson's trust in Riffo and Monson.[16] The third letter, dated December 1, 2005, contains inflammatory information about Sorenson's purported relationship with his father, his father's alleged affairs, and Sorenson's gratitude for being involved in Riffo's project because it gave him back his self-esteem.[17]

Sorenson asked Defendants to produce the original of each letter, but Defendants denied having them. Even though the letters were addressed to Riffo, Riffo testified that he only received copies of the letters. In Interrogatory requests, Sorenson asked Defendants to describe how they came into possession of the letters. Riffo responded under oath that Sorenson hand-delivered the

---

[15] Letter to Riffo (Nov. 15, 2005) (Plaintiff's Ex. 1).

[16] Letter to Riffo, Monson, and Westmoreland (Nov. 29, 2005) (Plaintiff's Ex. 3).

[17] Letter to Riffo (Dec. 1, 2005) (Plaintiff's Ex. 5).

November 15th letter to him, Monson, and Wynn Westmoreland during a meeting.[18] Riffo was more indefinite about the November 29th and December 1st letter. He stated they were either received in the mail, or hand-delivered by Sorenson or Westmoreland.[19]

Yet, Sorenson testified that between November 23, 2005 and his resignation on December 8, 2005 he had no contact with Riffo or Monson. Monson corroborated this during his deposition.[20] Moreover, Westmoreland testified that he never saw the letters until the parties conducted depositions.

**Resignation and Packet**

On December 8, 2005, Sorenson sent a letter to Riffo, wherein he resigned his positions at Crypto and Global and asked for a return of his money. Later that same month, a packet was left on his mother's doorstep. The first page of the packet is handwritten and states that it was from the Salt Lake Tribune.[21] The packet contained "An Open Letter to the American Media Audience" that asserted negative allegations against the Sorensons.[22] The nature of the allegations are such that one could perceive the packet as a threat to disclose such information. The packet also contained copies of the November 29, 2005 and December 1, 2005 letters, as well as copies of other non-public

---

[18] Defendants' Responses to Plaintiff's and Third-Party Defendants' Discovery Requests, 5–6 (Plaintiff's Ex. 11).

[19] Id. at 6–7.

[20] Monson Depo., 101:21–104:7.

[21] See "Salt Lake Tribune" Packet, JC 000213 (Plaintiff's Ex. 10).

[22] Id. at JS 000214–15.

Crypto and Global corporate documents.[23]

**Handwriting Expert**

At the evidentiary hearing, George Throckmorton ("Throckmorton") testified as a handwriting expert. He examined the handwriting on twenty-six documents and concluded that Sorenson's signature on the second version of Exhibit "C"[24] was a trace-forgery. Significantly, although the forged Exhibit "C" was dated October 7, 2005, the document from which Sorenson's signature was traced was not executed until October 27, 2005.[25] Throckmorton also testified that the November 15th, November 29th, and December 1st letters were trace-forgeries as well. Defendants do not dispute that these documents contain trace-forgeries of Sorenson's signature.

Throckmorton further testified that he examined the packet that was left on Ms. Sorenson's doorstep. He concluded that the handwriting was done deliberately and slowly. He testified that such deliberation often shows that a person is attempting to disguise his writing and it makes a handwriting analysis more difficult. Nevertheless, the handwriting on the packet had some unusual letter formations and unique structures. Throckmorton examined documents that contained Riffo's handwriting and saw that the same unusual letter formations and unique structures were present in those documents. Based on this information, Throckmorton concluded it is "probable" that Riffo authored the writing on the packet.

**Woodward Testimony**

To further address Riffo's credibility, Scott Woodward testified at the evidentiary hearing.

---

[23] Id. at JS 000216–24.

[24] The second version of Exhibit "C" is Plaintiff's Exhibit 6.

[25] Throckmorton Report, 2 & attachment CR 0069 (Docket No. 182, Ex. A).

According to Woodward, Sorenson's father asked Woodward to meet with Riffo to review the technology. Woodward is a molecular geneticist and Director of the Sorenson Genealogy Foundation. Woodward and Riffo met together in November 2005. Prior to the meeting, Woodward submitted written questions to Riffo, but none of them were answered. Woodward testified that comments Riffo said at the meeting made Woodward question Riffo's credibility. For example, Riffo said that he was an expert in quantum physics. Woodward therefore asked him what his thoughts were about Schrödinger's cat. Woodward testified this is a well-known puzzle known even in beginning quantum physics, yet, Riffo merely responded that it was a good question and had no other answer.

Riffo then went on to tell Woodward that he knew of a government spy agency that was more secret than any of the other United States spy agencies. Riffo also told Woodward that he had chips implanted in a tooth and knee that were recording their conversation via a satellite that tracked him constantly. When Riffo was called to the stand to rebut allegations made by another witness, he did not address or rebut any of Woodward's testimony. Nor did he provide any testimony about his actual educational background.

## DISCUSSION

## I. DEFENDANTS INVOLVEMENT IN THE FORGED DOCUMENTS

### A. Exhibit "C" Forgery

It is undisputed that Sorenson's signature on the second version of Exhibit "C" is a trace-forgery. It is also undisputed that even though the document is dated October 7, 2005, the document from which Sorenson's signature was traced was not executed until October 27, 2005.[26] Defendants

---

[26] Throckmorton Report, 2 & attachment CR 0069 (Docket No. 182, Ex. A).

do dispute, however, who did the forgery or that they had any knowledge of it.

A review of the facts shows that Riffo and Monson testified they watched Sorenson sign the document on October 7, 2005. Given that Sorenson's signature is a forgery and was traced from a document executed on October 27th, it is not credible that Riffo and Monson watched Sorenson sign it. The document from which the signature was traced was a Joint Corporate Resolution of Crypto and Global.[27] Monson was the Secretary/Treasurer and he maintained many of the documents. Defendants therefore had access to the document from which Sorenson's signature was traced.

The fact of the forgery also should be viewed in the context of Riffo and Monson's testimony about how the second version of Exhibit "C" came to replace the first version. Although Sorenson fully executed the first version of Exhibit "C" by initialing each page and signing the last page, Defendants contend this document was replaced by the second version wherein Sorenson did not initial each page. Monson testified that after Sorenson and Defendants signed the second version, the original was given to Riffo. Notably both Monson's and Riffo's initials appear on the forged Exhibit "C", placing the document in their hands sometime after the authentic Exhibit "C" was signed. Yet, Defendants have not produced either the original or *any copy* of the second version of Exhibit "C" that contains a non-forged signature by Sorenson. More importantly, Defendants provided the forged Exhibit "C" to their counsel, who attached it to the counterclaim with the representation to the court that it is a "true and correct copy of the Confidentiality Agreement."[28] Defendants have failed, however, to prove the existence of a valid contract upon which their second

---

[27] Id. at CR 0069.

[28] Answer, Amended Counterclaim, Third-Party Complaint, and Jury Demand, ¶ 22 (Docket No. 24).

-9-

claim for relief is based.

Defendants nevertheless contend their claim should be allowed because Sorenson testified during his deposition that the signature on the last page of the document was his. Given that the signature was traced from Sorenson's signature on another document, his testimony was not surprising. Nor does his testimony magically turn a forged signature into a valid signature.[29] Because Defendants' claim is founded on a document that is admitted to be forged, the claim is improper and is hereby dismissed.

### B.    Fraudulent Letters, Packet, and the Woodward Conversation

With respect to the other forgeries, Defendants claim they did not forge the letters and that the evidence is too inconclusive to link the letters to them. Indeed, they argue it is equally likely that Sorenson or a cohort of his forged the letters to bolster Sorenson's case. The court disagrees. The evidence shows that Sorenson's signature on the letters was traced from non-public corporate documents. Defendants admit the original of those corporate documents are in their possession, not Sorenson's.[30] Moreover, Defendants used the forged letters during deposition to bolster their case

---

[29] To the extent Defendants are attempting to argue that Sorenson's testimony somehow refutes Throckmorton's testimony, the court is not persuaded. Throckmorton has provided clear evidence that the signature is a trace-forgery. Sorenson's testimony cannot alter that fact. Moreover, Sorenson's testimony does not establish that the parties executed a second Exhibit "C". Defendants, therefore, have no basis to assert their claim should be allowed.

[30] Letter from Defendants' counsel (Jan. 4, 2008) (Plaintiff's Ex. 9) (listing the original documents that Defendants have in their possession). The November 15th and December 1st letter were both traced from document control numbered CR 0057. Defendants admit that they have the original of CR 0057. The November 29th letter was traced from document control numbered CR 0052. Defendants admit that they have the original of CR 0052.

that Sorenson cancelled the Agreement merely because he had a change of heart.[31] Defendants also listed the letters as exhibits they intended to use at trial. It is clear from Defendants use of the documents at deposition and on their exhibit list that the documents help bolster their case. They do not aid Sorenson's claims. Moreover, Defendants' story about how they came into possession of the letters lacks credibility due to inconsistencies in the facts and the unlikelihood that Riffo received only copies of three letters that were addressed and delivered to him.

Besides the letters, Riffo has been linked to the packet. Due to the disguised writing on the packet, Throckmorton could only testify that it was "probable" that Riffo authored the writing. A review of the packet shows, however, that it contained two of the forged letters. Defendants admitted that besides producing the letters in this case, they had never given those letters to anyone else. Yet, despite not being disseminated, they appeared in the packet. Moreover, the packet contained other corporate documents that also are not public in nature. Riffo, however, had access to all of the documents.

Defendants' theory that another person compiled the packet to discredit Defendants is too improbable. Such a theory requires one to believe (1) that an unknown person disguised his handwriting to make it look like Riffo had authored the packet and disguised his own handwriting, (2) that the person had access to the forged letters and corporate documents otherwise in Defendants' possession, and (3) that the unknown person made a veiled threat against the Sorensons not for purposes of actually threatening the Sorensons, but to make it seem like Defendants were involved so they would be discredited. This theory is nothing more than speculation and would require the

---

[31] See e.g. Sorenson Depo., 205:13–18 (Docket No. 195, Ex. B) (Defendants' counsel stating the December 1st letter fit into the scheme of the other letters in showing a change of heart by Sorenson).

court to disregard the evidence that is before it.

Finally, there is the testimony of Woodward regarding a conversation he had with Riffo. Riffo provided no evidence or testimony to rebut any assertion made by Woodward. The statements made by Riffo call into question his credibility and how much weight the court should give to his testimony. In contrast, Sorenson has offered significant, credible evidence that supports Defendants' were involved in the forgeries. Indeed, when one views the totality of the circumstances, the court finds that the evidence is clear and convincing that Defendants either authored the forged documents or knowingly proffered forged documents as evidence to establish and bolster their claims against Sorenson and to defend against Sorenson's claims against them.

## II.   SANCTIONS

### A.   Standard for Sanctions

Courts have the inherent "power to 'levy sanctions in response to abusive litigation practices.'"[32] "Many courts have found the fabrication of evidence to be an abusive litigation practice, or even a type of fraud on the court."[33] Because individuals have a right to due process, sanctions may not be imposed lightly.[34] Indeed, courts favor "adjudication on the merits."[35] This, however, must be balanced against "the need to maintain institutional integrity and the desirability

---

[32] Gilmer v. Colo. Inst. of Art, Educ. Mgmt. Corp., No. 00-1192, 12 Fed. Appx. 892, 894 (10th Cir. 2001) (quoting Roadway Express, Inc. v. Piper, 447 U.S. 752, 765 (1980)).

[33] Id.

[34] See Aoude v. Mobile Oil Corp., 892 F.2d 1115, 1118 (1st Cir. 1989).

[35] Id.

of deterring future misconduct."[36] "Dismissal is proper where the party's conduct is due to willfulness, bad faith, or fault, and there is a nexus between the misconduct and the matters in controversy such that the rightful decision of the case is threatened."[37]

## B. Five-Factor Analysis

When balancing whether a case should be dismissed, the following five factors should be considered:

> (1) the degree of actual prejudice to the [non-culpable party]; (2) the amount of interference with the judicial process; (3) the culpability of the litigant; (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for non-compliance; and (5) the efficacy of lesser sanctions.[38]

### 1. Prejudice

"The submission of falsified evidence substantially prejudices an opposing party by casting doubt on the veracity of all of the culpable party's submissions throughout litigation."[39] As a result, a party must expend substantial time and money to corroborate the culpable party's submissions.[40] Here, the forgeries have pervaded this lawsuit. They were produced by Defendants in discovery and used by them in deposition. Sorenson had to retain a hand-writing expert and cull through documents to identify how the forgeries were done. Because of Defendants' refusal to withdraw the

---

[36] Id. (citations omitted).

[37] First Source Fin. USA, Inc. v. nBank, N.A., No. 2:06-cv-1290, 2008 U.S. Dist. LEXIS 5192, at *12 (D. Nev. Jan. 8, 2008) (citation omitted).

[38] Garcia v. Berkshire Life Ins. Co. of Am., No. 08-1022, at 8 (10th Cir. filed June 10, 2009).

[39] Id. at 10.

[40] Id.

forgeries, Sorenson had to spend time and money filing this motion and attending an evidentiary hearing. It is clear that Defendants' actions have substantially prejudiced Sorenson.

### 2. Interference with the Judicial Process and Culpability

The court has addressed Defendants' culpability in Section I. With respect to interference with the judicial process, the evidence shows a nexus between Defendants' misconduct and the matters in dispute. The forged Exhibit "C" (a confidentiality and non-disclosure agreement) is the document upon which Defendants' second claim is founded. It therefore is intimately connected with that cause of action. Moreover, Defendants defeated a previous motion for summary judgment based on that document. Furthermore, the document permeates most of Defendants' other causes of action because Defendants claim Sorenson improperly acquired and used proprietary information.

With respect to Defendants' first claim for breach of the Agreement, the forged letters bolster Defendants' position that "Joseph Sorenson breached the Agreement and resigned as an officer ... based on pressure he was receiving from his father, James L. Sorenson."[41] Defendants used the letters in deposition and Defendants' counsel even argued the December 1st letter fit into the scheme of the other letters in showing a change of heart by Sorenson.[42] Additionally, Defendants listed the letters as exhibits they "intended" to use at trial, not just exhibits they "may use" at trial. While the letters did not form the Agreement, they certainly could interfere with the fact-finder's decision about the case. Each of these factors show interference with the judicial process.

---

[41] Answer, Amended Counterclaim, Third-Party Complaint, and Jury Demand, ¶ 19 (Docket No. 24).

[42] See Sorenson Depo., 205:13–18 (Docket No. 195, Ex. B).

-14-

3.    Warning

This court has not warned Defendants that their case may be dismissed due to the forgeries. Nevertheless, "where false answers are given 'under oath,' . . . additional warning are 'superfluous at best.'"[43] Here, Riffo and Monson both testified under oath they watched Sorenson sign the second version of Exhibit "C" on October 7, 2005. As discussed previously, this is impossible given that it is a trace-forgery. Besides Defendants' false testimony under oath, they have ignored a prior discovery order issued by Magistrate Judge Nuffer in this case.[44] The court therefore concludes additional warnings are not likely to be heeded.

4.    Efficacy of Lesser Sanctions

Defendants contend they should not be sanctioned for appending a forged document to their counterclaim. In fact, Defendants argue that none of their claims should be dismissed because Sorenson testified during deposition that the signature on Exhibit "C" was his. As stated earlier, Sorenson's deposition testimony does not change the fact that the second version of Exhibit "C" is a forged document. That Defendants continue to argue the forged document should be allowed to prove their case shows not only a disregard of their own misconduct, but also a disrespect for the entire judicial process. This disrespect is further shown by Defendants listing the forged letters as trial exhibits, after Defendants had already received Throckmorton's Report about the forgeries. Only when this motion was filed did Defendants offer to remove them from their exhibit list. Such actions are troubling and have no place in litigation.

---

[43] Garcia, No. 08-1022, at 11 (quoting Chavez v. City of Albuquerque, 402 F.3d 1039, 1045 (10th Cir. 2005)).

[44] Order, 1–2 (Mar. 10, 2009) (Docket No. 213).

Were this court merely to dismiss Defendants' second claim and not allow the letters to be presented to the jury, the court would only be doing what Defendants should have already done. Indeed, "[l]itigants would infer that they have everything to gain, and nothing to lose, if manufactured evidence merely is excluded while their lawsuit continues."[45] This is not a sufficient sanction for Defendants' misconduct.

Moreover, the court's decision is this matter is impacted by Defendants' actions before Magistrate Judge Nuffer. Prior to this evidentiary hearing, Magistrate Judge Nuffer held a hearing related to a discovery issue. After Defendants continued to fail to provide information, Magistrate Judge Nuffer stated "the Court has lost faith in getting a straight answer from Defendant Jose Arturo Riffo, and finding that Mr. Riffo is being purposefully obstructive and not doing what he could do to comply with the Court's previous orders in this regard," he allowed Sorenson to obtain discovery outside of the discovery period.[46] His order shows Defendants have engaged in obstructive behavior in multiple ways throughout these proceedings. Because Defendants' misconduct has infected the entire course of this case and interfered with the judicial process, the court concludes a lesser sanction would not be appropriate.

The court therefore dismisses all of Defendants' counterclaims as a sanction for their actions. The court concludes dismissal of Defendants' counterclaims is a sufficient sanction for their misconduct. Accordingly, the court will not enter judgment against them on Plaintiff's claims. Where appropriate, however, the court will permit Sorenson to introduce evidence about Defendants' misconduct for purposes of impeaching Defendants' credibility. The court will reserve ruling on

---

[45] Garcia, No. 08-1022, at 11 (quotations and citation omitted).

[46] Order, 1–2 (Mar. 10, 2009) (Docket No. 213).

whether attorney fees should be awarded for the expense incurred in bringing this motion until the

parties have briefed this issue. The court therefore GRANTS IN PART and DENIES IN PART

Sorenson's motion.[47]

SO ORDERED this 12th day of June, 2009.

BY THE COURT:

Clark Waddoups
United States District Judge

[47] Docket No. 183.